Troy PIERCE *v.* Casie PIERCE

CA 00-1231                                        43 S.W.3d 192

Court of Appeals of Arkansas
Division III
Opinion delivered April 25, 2001

*Bridges, Young, Matthews & Drake PLC,* by: *Michael J. Dennis,* for appellant.

*Sharon M. Fortenberry,* for appellee.

ANDREE LAYTON ROAF, Judge. Troy Pierce appeals from an order of the Jefferson County Chancery Court denying his petition for change of custody. Troy alleged in his petition that his five-year-old son Lucas had suffered cigarette burns on his arm from the child's twenty-year-old half-brother Todd Grinstead, who also lived in the home with the child's mother, appellee Casie Pierce. On appeal, Troy argues that the chancellor erred in refusing to change custody after he proved that the abuse took place. We reverse and remand for appointment of a guardian *ad litem* and for further proceedings not inconsistent with this opinion.

At a hearing on the change-of-custody petition, a Jefferson Regional Medical Center certified emergency-room physician, Dr. Angelique Fontenette Burton, testified that on June 16, 2000, she observed three one-centimeter circular lesions on Lucas's right arm. She stated that to a reasonable degree of medical certainty the circular lesions, which were second-degree burns surrounded by first-degree burns, were caused by a cigarette. The condition of the burns indicated that they were twenty-four hours old. According to Dr. Fontenette, Lucas told her that the burns were caused by Grinstead, but also stated that he did not tell his mother because he did not want to get Grinstead in trouble. Charge nurse Wannetta Clowers corroborated Dr. Fontenette's testimony and also stated that she observed bruises on Lucas, some of which Lucas claimed were caused by Grinstead.

Sharon Pierce, Troy's new wife of two years, testified that she was present when Troy picked up Lucas for visitation on June 16, 2000, and she heard Casie state in regard to the burns on Lucas's arm that he was "broken out." Sharon stated that she examined Lucas's arm, which was covered in Calamine lotion. When she questioned Lucas about it, Lucas told her that Grinstead had burned him. She claimed that she believed that Grinstead had hurt Lucas

on prior occasions, but when Troy had reported this suspected abuse to DHS, no abuse was found to have occurred. According to Sharon, each time after Troy made these reports, Casie retaliated by not allowing Troy to exercise visitation with Lucas for long periods of time.

Detective Henry Hudspeth of the Pine Bluff Police Department testified that he investigated a possible battery to Lucas, and in the course of that investigation, he interviewed Lucas, Troy, Sharon, and Casie as well as Dr. Fontenette and Nurse Clowers. Detective Hudspeth stated that Lucas told him that Todd Grinstead burned him with a cigarette, and he believed the child. However, Detective Hudspeth also stated that Lucas also told him "other stories," including that he was burned on more than one occasion and that the burns were mosquito bites. Detective Hudspeth testified that he also interviewed Grinstead and that Grinstead denied hurting Lucas, however, Grinstead did admit that he had a drug problem. Detective Hudspeth stated that Grinstead was arrested on the battery charge on the night of June 16. According to Detective Hudspeth, Troy took and passed a polygraph test concerning whether he coerced Lucas in any way to incriminate Grinstead. He also stated that Grinstead and Casie refused to take a polygraph.

Troy testified that he called DHS on prior occasions, suspecting that Lucas had been abused. He stated that he found bruises on Lucas's arm from someone grabbing him and also bruises on the child's neck. However, DHS found the abuse allegations unsubstantiated. Regarding the night when he discovered the cigarette burns on Lucas, he stated that when he picked up his son, he noted that Casie had put Calamine lotion on the lesions and told him that Lucas had "broken out" with something. He testified that when he returned from a wedding, his wife Sharon told him that when she asked Lucas about his "boo-boos," the child stated that Grinstead had burned him with a cigarette.

In Casie's case-in-chief, Grinstead testified that he had been charged with second-degree battery in connection with the cigarette burns on Lucas's arm, but that the charges had been dropped. He claimed that he had stopped smoking cigarettes by the time Lucas received the lesions on his arm. However, Grinstead admitted that he had a drug problem at the time of the alleged incident, and that Casie's brother Jerry Trustee, who was also a drug-user, was living in the home at that time. According to Grinstead, although he did not smoke at the time, Casie and Casie's other son, Shane, did.

Lavonda Bailey, a family-service worker with DHS testified that she investigated two previous reports of abuse on February 10, 2000, and March 27, 2000, and that the allegations were unsubstantiated. However, she admitted that Lucas had told her that Grinstead had grabbed him by the arm and scratched him on the neck and that Grinstead "really hurts him sometimes." Bailey stated that Lucas told her that Grinstead grabbed him after he punched Grinstead "real hard" in the stomach and the eye, and that she did not regard that as abuse. She also stated that Lucas told her that sometimes he tells his parents that Grinstead hurts him to get Grinstead into trouble and that Lucas stated that Grinstead did not hurt him intentionally. She also stated that she found no permanent marks on the child. However, Bailey admitted that she had not investigated the cigarette-burn incident.

Casie testified that Lucas did not want to go to Troy's residence for visitation. She admitted that she put Calamine lotion on Lucas's lesions prior to his June 16 visit, believing that the burns were chigger or mosquito bites. According to Casie, Lucas had been scratching the lesions for three or four days. She intimated that the lesions looked like impetigo. Casie claimed that she took Lucas to his primary doctor, Dr. Wesley Cluck, and to the Arkansas Children's clinic where she was told to put Neosporin on the lesions. According to Casie, she subpoenaed Dr. Cluck, but he did not appear at the hearing. Casie claimed that she asked Lucas if Grinstead had burned him and Lucas told her that he did not. Casie claimed that Lucas made the allegation against Grinstead because Troy and Sharon would not accept his story that the lesions were "bug bites." Casie stated that while she was at work, Grinstead and Shane took care of Lucas. She admitted that she was aware that Grinstead smoked marijuana, as did her brother Jerry, who also lived in her home. After the hearing, the chancellor filed an order stating that he found insufficient evidence to warrant a change in custody. He then ordered regular visitation and appropriate child support, including an arrearage of more than $8,000.

On appeal, Troy argues that where medical evidence, stated to a reasonable degree of medical certainty, evidenced that a child had been burned several times on the arm by a cigarette and where the only person that the child attributed those burns to was a twenty-year-old half-brother, an admitted drug user who lived in the home with the child, the chancellor erred in failing to grant his petition for change of custody. Troy argues that the testimony of Dr. Fontenette and Nurse Clowers was clear, concise, and stated to a reasonable degree of medical certainty that Lucas had sustained

multiple cigarette burns on his arm. He also stated that Lucas related to several disinterested persons that Grinstead had burned him and that no medical evidence was presented to challenge this diagnosis. Further, citing *Rector v. Rector*, 58 Ark. App. 132, 947 S.W.2d 389 (1997), he contends that the drug use by Grinstead, a frequent caretaker of Lucas, is relevant in determining the best interest of the child. Regarding Grinstead's claim that he no longer smoked marijuana, Troy contends that Grinstead made the same claim to Bailey when she interviewed him on February 11, 2000, a claim that Grinstead himself refuted in his testimony at the hearing. Troy asserts that the clear evidence of child abuse in the home dictates that custody should be changed.

■ ■ This court reviews chancery decisions *de novo* and reverses only if it finds that the chancellor's findings are clearly against the preponderance of the evidence. *Fitzpatrick v. Fitzpatrick*, 29 Ark. App. 38, 776 S.W.2d 836 (1989). In a custody hearing, the court considers what is in the best interest of the child. Ark. Code Ann. § 9-13-101 (Repl. 1998). In child-custody cases, the chancellor has a heavy burden of evaluating the witnesses, their testimony, and determining what is in the child's best interest.

■ While this court generally defers to the superior position of the chancellor to judge the credibility of the witnesses, nonetheless, on *de novo* review, we do not abdicate our role in determining the best interest of the child. Here, the record indicates that Lucas was the victim of either heinous abuse that the custodial parent tolerated or the noncustodial parent's campaign of lodging unfounded complaints of abuse. The potential for egregious harm to Lucas if the former situation is in fact true is self-evident. However, if the situation is of the latter, the risk to Lucas is also considerable. There is a significant and growing body of scholarly writing that has identified high-conflict custody disputes as forms of child abuse and maltreatment. *See generally* H. Patrick Stern, M.D., *Battered Child Syndrome: Is it a Paradigm for a Child of Embattled Divorce*, 22 U. ARK. LITTLE ROCK L. REV. 335 (2000); *see also* Kathleen Coulborn Faller, Ph.D., *Child Maltreatment and Endangerment in the Context of Divorce*, 22 U. ARK. LITTLE ROCK L. REV. 429, 446 (2000).

■ In our *de novo* review, all issues of law or fact raised in the chancery court are before this court for determination. *See Hansen v. Hansen*, 11 Ark. App. 104, 666 S.W.2d 726 (1984). Where error appears and the record is fully developed so that we can plainly see where the best interest of a child lies, we will correct the error by

entering the decree that should have been entered by the chancellor. *Id.* However, in this case, we cannot say that the record is fully developed as there was no satisfactory determination of what happened to Lucas. Additionally, there was very little evidence presented concerning Troy's home. Moreover, nearly seven months have now passed since the custody hearing was held. An appellate court has the discretionary power to remand an equity case for further testimony or proceedings on a limited point if that is necessary to achieve equity. *Id.* (citing *Arnett v. Lillard*, 247 Ark. 931, 448 S.W.2d 626 (1970)); *see also Ferguson v. Green*, 266 Ark. 556, 587 S.W.2d 18 (1979)). We therefore exercise our discretion and reverse and remand for further proceedings and order that the chancellor appoint a guardian *ad litem* to thoroughly investigate this case and make recommendations concerning custody.

Reversed and remanded with instructions.

STROUD, C.J., and PITTMAN, J., agree.